# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>HANK EDWARD HARRINGTON,<br><br>Defendant. | No. CR09-4060-MWB<br><br>**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

On November 19, 2009, the grand jury returned a seven-count indictment charging the defendant Hank Edward Harrington, together with codefendants Chad Jay Larson and Jamie Alissa Peterson, with drug and firearm charges. Harrington is charged in Count 1 with conspiracy to manufacture and distribute methamphetamine, in Count 3 with manufacturing methamphetamine, in Count 4 with manufacturing or distributing methamphetamine, and in Count 7 with being an unlawful user of methamphetamine in possession of firearms. The Indictment also includes forfeiture allegations. *See* Doc. No. 1. On December 16, 2009, the grand jury returned a Superseding Indictment against the same defendants that amended the time frame of the conspiracy charged in Count 1. *See* Doc. Nos. 34 & 35.

On January 19, 2010, Harrington filed a motion to suppress evidence arising from the search of his vehicle on July 14, 2009. Doc. No. 60. The Trial Management Order assigned motions to suppress to the undersigned for appropriate disposition. *See* Doc. No. 29. The court held a hearing on the motion on February 4, 2010, at which Assistant United States Attorney Kevin Fletcher appeared on behalf of the plaintiff (the "Government), and Harrington was present with his attorney, Paul Scott. The Government called three witnesses at the hearing, to-wit: Buena Vista County Sheriff's Deputies Marty DeMuth and Joseph Speers, and Iowa Division of Narcotics Enforcement Agent Chris Nissen. Two exhibits were admitted into evidence, to-wit: **Gov't Ex. 1a** - a CD containing

a video recording of officers' interview of Harrington on July 14, 2009; and **Gov't Ex. 1b** - a CD containing audio recordings of two conversations between Harrington and Nissen on July 14, 2009.

The court has reviewed the parties' briefs and the Government's exhibits, and considered the witnesses' testimony and the arguments of counsel, and makes the following report and recommendation on the motion to suppress.

## *BACKGROUND FACTS*

On July 10, 2009, Buena Vista County law enforcement officers, including Deputy Speers, executed a search warrant at the residence of Chad Larson and Jamie Peterson. When they arrived at the residence, Harrington was standing outside next to a dark blue pickup truck. Larson and Peterson were present, as was Peterson's daughter.

The officers also had arrest warrants for Larson and Peterson for buying in excess of the legal limit of pseudoephedrine. In reviewing pill logs, Speers had seen Harrington's name on occasion, but Harrington had not violated any laws relating to his purchase of pseudoephedrine pills.

During the search of the Larson residence, the officers located a number of items associated with a methamphetamine manufacturing lab. Harrington was allowed to leave the scene because the officers had no evidence that he had done anything illegal. The officers asked Harrington if he would take Peterson's daughter home, and he agreed.

After the search, the officers spoke with Peterson briefly, but she then asked for an attorney and they stopped speaking with her. The next day, July 11th, Peterson asked to speak with Speers. Speers and a Storm Lake police officer interviewed Peterson, and she provided them with information on numerous subjects who were connected with methamphetamine manufacturing and distribution. Peterson stated Harrington had not been involved in the methamphetamine "cook" that had taken place on July 9-10, 2009, but Harrington had on occasion supplied her and Larson with anhydrous ammonia and

2

pseudoephedrine pills in exchange for methamphetamine. She was not sure if Harrington had supplied the anhydrous for the cook on July 9-10, 2009, or if Larson had procured the anhydrous himself.

Officers from the Buena Vista County Sheriff's office contacted Agent Nissen on July 13, 2009, to ask him to assist in an investigation of methamphetamine manufacturing in Buena Vista County. He met with the officers and they discussed the search warrant that had been executed at Larson's residence on July 10th. Nissen returned to Buena Vista County on July 14th, with the intention of attempting to make contact with Harrington and another individual, Brittany Wirtjers, whom Peterson had mentioned as being involved in methamphetamine manufacturing activities.

Nissen and Speers left the Buena Vista County Sheriff's office in Nissen's vehicle, a black Chevrolet extended-cab pickup truck. The truck is equipped with a red-and-blue emergency light system, headlight flashers or "wigwags," and a full siren system. The officers were in plain clothes and Nissen's truck is unmarked. The officers first went to see Wirtjers in Sac City, Iowa. She provided them with some information, but nothing regarding Harrington. The officers next went to Harrington's residence in Truesdale, Iowa, but Harrington was not home. They then went to Harrington's father's residence southeast of Storm Lake, Iowa, and Harrington's father stated Harrington had just left and was heading back home. Nissen and Speers decided to try to catch up with Harrington.

The officers left Harrington's father home traveling northbound on Highway 71 towards Truesdale. They met a truck traveling southbound, and Speers recognized the truck as Harrington's because Speers had seen the truck at Larson's residence when the search warrant was executed. The officers turned around and began following Harrington. Harrington turned westbound on 580th Street, which is a gravel road. Nissen testified the officers were quite a ways back from Harrington's vehicle, and Harrington was traveling at a high rate of speed. He believed Harrington had increased his speed to greater than the 55-mile-per-hour posted speed limit.

3

When they had traveled about a mile westbound on the gravel road, Harrington slowed somewhat but went through a stop sign without stopping. The officers continued to follow Harrington while Speers placed a call to Deputy DeMuth, who was on duty at the Sheriff's office. DeMuth drives a marked patrol car and was in uniform. Speers asked DeMuth to come to the area to initiate a traffic stop of Harrington based on the fact that Speers and Nissen had witnessed Harrington run the stop sign. DeMuth agreed, and started toward the area in his patrol car. Before DeMuth arrived in the area, Harrington stopped at a stop sign on 110th Avenue where it dead-ends into C-49. At the time Harrington stopped, Nissen and Speers were approximately 100 yards behind him.

Nissen and Speers pulled up behind Harrington, and they could see Harrington looking at them in his rearview mirror. They concluded Harrington knew they were following him, so Nissen decided to make contact with Harrington. Nissen was aware that his truck was unmarked and the officers were in plain clothes, so immediately as he exited his truck, he displayed his credentials so Harrington could see them in his side mirror as Nissen approached his truck. Nissen continued to display his credentials all the way up to the driver's window of Harrington's truck. Speers also exited Nissen's truck and walked forward to the right rear of Harrington's truck, where he stopped and waited.

When Nissen reached Harrington's truck, the driver's side window was down. Nissen introduced himself and showed Harrington his credentials. Nissen testified he did not have his firearm drawn, and he had never activated his emergency lights. Nissen did not mention the traffic violation, but he told Harrington that he was a narcotics agent and he wanted to talk to Harrington about a methamphetamine manufacturing investigation. Nissen kept his tone "very casual," because he wanted the encounter to remain completely voluntary and noncustodial. Nissen observed that Harrington appeared to be very nervous. Nissen asked Harrington if he would be willing to talk with the officers for a few minutes. According to Nissen, Harrington said something like, "I've gotta tell you, I've got guns in the back of my truck." Nissen asked Harrington if he would step out and come to the

back of the truck so they could have a conversation. Nissen testified that if Harrington had declined to be interviewed, or had just driven away, then the officers would have continued to follow Harrington until DeMuth could stop him for the traffic violation. However, Harrington agreed to talk with the officers. Harrington got out and walked to the back of his vehicle, put the tailgate down, and sat down on the tailgate. According to Nissen, only a few seconds had passed from the time he first made contact with Harrington until Harrington got out of his vehicle.

Nissen told Harrington that the officers were in the middle of a narcotics investigation, they knew Harrington was an associate of Larson's, and Larson was in custody. Nissen asked Harrington if he was a drug user and when he last used drugs. Harrington stated he was a methamphetamine user, and he had last used methamphetamine the preceding day. Nissen testified that Harrington exhibited physical signs of methamphetamine use. He appeared extremely agitated and fidgety, and he made quick, excited body movements. Nevertheless, he was coherent and cooperative, and Nissen believed Harrington understood his questions, his responses were appropriate to the questions, and he was able to carry on a conversation.

Nissen asked Harrington if he would come to the Buena Vista County Sheriff's office and talk with them, and Harrington agreed. Nissen told Harrington that the interview was voluntary. Harrington was never handcuffed, and neither of the officers touched him. Because Harrington appeared extremely agitated and had said there were firearms in his vehicle, Nissen asked if Harrington would allow Speers to drive his truck. Harrington indicated that would be fine. Speers got into Harrington's truck, started the engine, and began to drive toward the Sheriff's office. Harrington rode in the front passenger's seat of Nissen's truck.

Immediately after Nissen and Harrington entered Nissen's truck, Nissen activated a digital audio recorder. Their conversation appears as the first file on Gov't Ex. 1b. They had a conversation in which Nissen confirmed that Harrington had stated he had

5

firearms in his truck, had consented to the interview, had allowed Speers to drive his truck, and had agreed to come with Nissen in his truck. Nissen estimates that from the time Harrington stopped at the stop sign to the time they reached the Sheriff's office, about ten to fifteen minutes elapsed.

At the Sheriff's office, the firearms were removed from Harrington's truck and were secured. The officers advised Harrington repeatedly that he was there voluntarily, and if he ever wanted to leave or felt threatened in any way, he could leave. They asked Harrington to step into an interview room, where they interviewed him. The interview was recorded on audio and video. After they exited the interview room, Nissen again activated his digital audio recorder, and his further conversation with Harrington is contained in the second file on Gov't Ex. 1b.

Rather than allowing Harringon to drive to his father's residence, the officers drove him there because during the interview, they learned that he actually had last used methamphetamine that morning, and they did not want him to drive in an altered condition. Harrington stayed at his father's residence, and the officers left.

*DISCUSSION*

Harrington argues the officers "stopped" Harrington, and the stop was illegal because the officers never told Harrington he was being stopped for running a stop sign. He argues he was not free to leave, and the encounter was custodial. He further argues that he was under the influence of drugs, affecting his judgment and his ability to consent to the interview. He cites cases dealing with warrantless searches under the Fourth Amendment, and argues, "This is a bad stop case." Doc. No. 60.

Little discussion is required to resolve Harrington's motion. The court finds there was no "stop," no search, and no seizure. The officers' contact with Harrington was not even an investigative stop under *Terry v. Ohio*, 391 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (holding an officer may stop and detain someone briefly for purposes of inquiry

when officer believes criminal activity may be afoot).  The officers did not stop Harrington; he stopped at a stop sign, saw the officers in his rearview mirror, and, on this record, simply waited until Nissen got out of his truck and made contact with him.  Harrington was not detained in any sense of the word.  He was asked if he would talk with the officers.  He agreed, voluntarily exited his vehicle, consented to have Speers drive his truck to the Sheriff's office, and voluntarily got into Nissen's truck and rode with him the short distance to the Sheriff's office.

The Government's exhibits clearly show that the encounter between Harrington and the officers was voluntary and noncustodial.  The audio and video tapes also demonstrate that Harrington was coherent, responded appropriately to questions, and was fully capable of consenting to be interviewed.  Harrington's motion to suppress should be denied.

Accordingly, for the reasons discussed above, IT IS RESPECTFULLY RECOMMENDED that Harrington's motion to suppress be **denied**.  Objections to this Report and Recommendation must be filed by **February 22, 2010**.  Responses to objections must be filed by **February 25, 2010**.

**IMPORTANT NOTE:**  Any party planning to lodge any objection to this Report and Recommendation must order a transcript of the hearing promptly, but no later than **February 18, 2010**, <u>regardless of whether the party believes a transcript is necessary to argue the objection</u>.  If an attorney files an objection without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 17th day of February, 2010.

_____
PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT